**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 25-1848**

—————————

THE CINCINNATI INSURANCE COMPANY,

        Plaintiff – Appellee,

    v.

LEVI OWENS, Personal Representative for the Estate of Christopher McLean,

        Defendant – Appellant,

    and

WILMINGTON SHIPPING COMPANY; WAYNE HUNT,

        Defendants.

—————————

Appeal from the United States District Court for the District of South Carolina, at Florence. Jacquelyn Denise Austin, District Judge.  (4:24-cv-00951-JDA)

—————————

Argued:  March 20, 2026                               Decided:  August 10, 2026

—————————

Before KING, WYNN, and RUSHING, Circuit Judges.

—————————

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge King and Judge Wynn joined.

—————————

**ARGUED:**  John E. Parker, Jr., PARKER LAW GROUP, LLP, Hampton, South Carolina; Jason Scott Luck, Bennettsville, South Carolina, for Appellant.  Charles Daniel Atkinson, WILKES ATKINSON & JOYNER, LLC, Spartanburg, South Carolina, for Appellee.  **ON**

**BRIEF:** M. Taylor Petty, WILKES ATKINSON & JOYNER, LLC, Spartanburg, South Carolina, for Appellee.

_____

RUSHING, Circuit Judge:

Plaintiff Cincinnati Insurance Company sought a declaration from the district court that it had no duty to defend or indemnify Wayne Hunt, an employee of Cincinnati's insured, in relation to an underlying wrongful-death action against Hunt in South Carolina state court. The district court granted summary judgment to Cincinnati, finding that it owed no duty to defend or indemnify Hunt because Cincinnati was not timely notified of the underlying action and suffered material prejudice as a result. Defendant Levi Owens now appeals, contending that the district court erred in (1) declining to stay this case pending the resolution of post-judgment motions in the state wrongful-death action, (2) denying Owens's motion to amend his answer to assert a counterclaim, and (3) prematurely granting summary judgment to Cincinnati. Finding no reversible error, we affirm.

## I.

### A.

In December 2013, Wayne Hunt, an employee of Wilmington Shipping Company (WSC), was driving a truck that WSC had leased from Penske Truck Leasing Co., Ltd. Hunt got into an accident with another vehicle in which Christopher McLean was riding as a passenger. McLean died in the crash.

Three years later, Levi Owens, as the representative of McLean's estate, sued Hunt in the Court of Common Pleas of Marlboro County, South Carolina. Owens alleged that Hunt's negligent and reckless conduct caused McLean's death. Owens served Hunt—an out-of-state motorist—through the South Carolina Department of Motor Vehicles. After

3

Hunt failed to answer the complaint, the state court entered a default and referred the case to a special referee to determine damages and award a default judgment.

Years later, in November 2021, the special referee conducted a damages hearing. Neither Hunt nor his counsel appeared at the hearing. The special referee found that Hunt's negligence and recklessness caused McLean's death and awarded Owens $5,100,000 in damages. The order was entered as an "order awarding default judgment." J.A. 187 (capitalization omitted).

In October 2022—a little less than a year after the state court entered the default judgment and about two weeks before the start of this federal declaratory judgment action—Hunt moved under South Carolina Rule of Civil Procedure 60(b) to vacate the default judgment.[1] As relevant here, Hunt argued that the default judgment should be vacated because he was not properly served. In the meantime, after attempts to collect from Hunt failed, Owens filed in March 2024 a "motion for supplemental proceedings . . . with the intent of seeking a judicial assignment of any bad faith or breach of contract claims that Hunt may have against" Cincinnati. Opening Br. 6 (capitalization omitted).

After a hearing, the state court referred both the motion to vacate the default judgment and the motion for supplemental proceedings to a special referee. Both motions remained unresolved throughout the federal district court proceedings below. During this appeal, however, Owens notified this Court that the special referee denied Hunt's motion

---

[1] By this time, Hunt was represented by counsel retained by Cincinnati under a reservation of rights.

to vacate the default judgment on January 5, 2026.  *See Owens v. Hunt*, No. 2016-CP-34-00265, 2025 WL 4054489 (S.C. Ct. Common Pleas Jan. 5, 2026).[2]

B.

In November 2022—about two weeks after Hunt moved to set aside the default judgment in state court—Cincinnati sued in federal district court, seeking a declaration that it "ha[d] no duty to defend or indemnify Hunt" under the insurance policies it issued to WSC.  J.A. 26.  The complaint named Hunt, Owens, and WSC as defendants.[3]  Cincinnati alleged that it did not receive notice of the state wrongful-death action "until recently" before it filed its complaint and, notably, after the state court had entered the default judgment against Hunt.  J.A. 24.  Because the relevant insurance policies required prompt notice, and the lack of notice resulted in "material prejudice" to Cincinnati's ability "to investigate and defend the Wrongful Death Action," Cincinnati claimed that it was entitled to a judgment declaring that it had no duty to defend or indemnify Hunt.  J.A. 26.

Owens answered Cincinnati's complaint and, relevant here, asserted as defenses "all defenses and laws as stated in the federal Motor Carrier Act of 1980 (49 U.S.C. § 13906), and specifically . . . that said act preempts state law govern[ing] Cincinnati's insurance

---

[2] The special referee's order is incorrectly dated January 5, *2025*.

[3] The complaint also named Maisha Jacobs, who was the driver of the vehicle carrying McLean as a passenger.  Jacobs "ultimately settled with [Cincinnati] and was dismissed" from the federal action.  Opening Br. 3 n.1.  We therefore do not address her further.

5

policies." J.A. 215. He otherwise denied that Cincinnati was entitled to the declaratory judgment it requested.[4]

The case proceeded, and throughout the litigation, Owens moved several times for a stay. In February 2024, Owens moved to stay the case pending the resolution of Hunt's motion to vacate the state-court default judgment. In a text order, the district court denied the motion.

In March, Owens moved for supplemental proceedings in state court. The federal case then proceeded to discovery. In the parties' discovery plan, Owens noted that he had "commenced supplemental proceedings" in the wrongful-death action with the hope of "receiv[ing] a judicial assignment of Hunt's rights" against Cincinnati. J.A. 311. Once that occurred, Owens explained, he "intend[ed] to amend his Answer to assert counterclaims for bad faith and breach of contract, as well as a declaration that [Cincinnati] is obligated to make payments toward the default judgment under any MCS-90 endorsements" attached to the Cincinnati policies. J.A. 311.

In September 2024, one day before the deadline to amend pleadings, Owens moved for an extension of time to file his amended answer or, in the alternative, a stay of deadlines. Owens claimed that he needed a 60-day extension so that he could "obtain a judicial assignment prior to amending his Answer" to assert his counterclaims against Cincinnati. J.A. 331. He also requested, in the alternative, a stay of deadlines "to avoid unnecessary

---

[4] The district court eventually entered default judgments against Hunt and WSC. *See Cincinnati Ins. Co. v. Hunt*, No. 4:24-cv-00951-JDA, 2025 WL 1753693, at *6 (D.S.C. June 25, 2025). Because these defendants and the default judgments against them are not before us on appeal, we do not discuss them further.

further modifications of the Scheduling Order." J.A. 331. The district court granted the 60-day extension.

About one month later, Owens moved to "amend his Answer to assert a counterclaim asking for a declaration that the subject insurance policies' MCS-90 endorsement require[d] [Cincinnati] to" indemnify Hunt. J.A. 359. This was true, Owens asserted, even if Cincinnati ultimately proved that "it was not provided with prompt notice of the loss as required by its policies' cooperation provisions." J.A. 359. He attached a proposed amended answer asserting that counterclaim. Owens also claimed that because the special referee had not yet ruled on his motion for supplemental proceedings, he needed another 45-day extension of deadlines to ensure that he could "add a bad faith counterclaim" once he obtained the assignment of Hunt's rights in state court. J.A. 368–369; *see* J.A. 397 (Owens stating that he also wished to add a breach of contract claim).

The district court did not immediately rule on Owens's motions. On March 13, 2025, the deadline for dispositive motions, Cincinnati moved for summary judgment. That same day, Owens once again sought a stay of the deadlines, this time pending resolution of, as relevant here, his motion to amend his answer and a ruling in the state-court action. The district court granted the motion to stay in part, ruling that "[t]he unexpired deadlines in the scheduling order are stayed pending the Court's resolution of the pending motion to amend, [the federal] motion for default judgment [against Hunt and WSC], and [the] motion for summary judgment." J.A. 495.

About nine days later, Owens again moved for a stay, arguing that the district court should defer ruling on Cincinnati's motion for summary judgment until it ruled on Owens's

7

motion to amend. According to Owens, "any motion for summary judgment that [Owens] could file concerning" the MCS-90 endorsement counterclaim "would essentially serve as [his] response to [Cincinnati's] Motion for Summary Judgment." J.A. 497. And any ruling on Cincinnati's motion for summary judgment would "greatly prejudice [Owens] by potentially depriving him of an opportunity to effectively counter [Cincinnati's] motion." J.A. 497–498. As part of his request, Owens also asked that the court stay the deadlines so that he could have "an opportunity to file a Cross-Motion for Summary Judgment based upon any counterclaims he may be able to assert in this action." J.A. 498.

The district court entered two orders on April 14, 2025—one denying as futile Owens's motion to amend to assert the MCS-90 endorsement counterclaim, and the other denying the motion to stay the deadlines. Regarding the MCS-90 endorsement counterclaim, the court found it would be futile because that endorsement imposes obligations on Cincinnati "only [as] to the named insured, which, in this case is [WSC], not Hunt." J.A. 501. As for the stay of deadlines, the court denied the motion for stay but extended the deadline for Owens to respond to Cincinnati's motion for summary judgment until April 24.

Owens did not respond to Cincinnati's motion for summary judgment, and in June 2025, the district court granted the motion. *See Cincinnati Ins. Co.*, 2025 WL 1753693, at *1–6. The court found that neither Hunt nor WSC provided Cincinnati with timely notice of the wrongful-death action. *Id.* at *6. It then assumed without deciding that "Hunt [and] WSC had a good faith reason for their delay." *Id.* But even so, the court ultimately concluded that the delay materially prejudiced Cincinnati because it was unable to

8

"investigat[e] or litigat[e] the Wrongful Death Action," leading to the state court entering a default judgment against Hunt. *Id.* For that reason, the court found that Cincinnati "has no duty to defend or indemnify Hunt under the Policies regarding the Wrongful Death Action." *Id.*

Owens timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II.

Owens presents three main issues on appeal. First, he contends that the district court "should have stayed this case" pending the additional proceedings in the state wrongful-death action. Opening Br. 13. Second, he argues that the district court erred in denying as futile his motion to amend his answer to assert a counterclaim based on the MCS-90 endorsement. And third, he asserts that "[s]ummary judgment was premature in light of the issues raised by [his] motions to stay and amend." *Id.* at 27. Addressing each issue in turn, we conclude that each fails.

## A.

We begin with whether the district court erred in not staying this case pending resolution of the motion to vacate the default judgment and motion for supplemental proceedings in the state court. We have explained that "for a district court to . . . issue a declaratory judgment, two conditions must be satisfied." *White v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 913 F.2d 165, 167 (4th Cir. 1990). "First, the dispute must be a 'case or controversy' within the confines of Article III of the United States Constitution—the 'constitutional' inquiry." *Id.* "Second, the trial court, in its discretion, must be satisfied

9

that declaratory relief is appropriate—the 'prudential' inquiry." *Id.* Owens argues that neither condition was satisfied here. We disagree.

1.

Owens first argues that the district court "improperly assert[ed] Article III jurisdiction" by not staying this case pending resolution of the post-judgment motions in the state court. Opening Br. 16. According to Owens, by proceeding while those motions were pending, the district court issued "an opinion based on facts and circumstances that [were] unfixed, nonfinal, and hypothetical." *Id.* at 17. We review this issue de novo. *See Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 210 (4th Cir. 2021).

"The 'irreducible constitutional minimum of standing' requires the petitioner to allege a concrete injury that is 'actual or imminent, not conjectural or hypothetical.'" *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 199 (4th Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Ripeness, another justiciability doctrine, determines when a case or controversy is fit for judicial review." *Id.* "'[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)). "Though distinct doctrines, the Supreme Court has explained that justiciability problems, like those here, can often be described as either standing or ripeness while addressing the same fundamental question." *Id.* at 199 n.4. Here, that fundamental question is "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient

10

immediacy and reality to warrant the issuance of a declaratory judgment.'" *White*, 913 F.2d at 167–168 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

In assessing the justiciability of declaratory judgment cases involving duties under insurance policies, we have distinguished between "duty to defend" claims and "duty to indemnify" claims—both of which Cincinnati asserted here. "The duty to defend refers to an insurer's obligation to defend its insured when a third party files suit." *Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 448 F.3d 252, 257 (4th Cir. 2006). Under North Carolina law,[5] the duty to defend "'is ordinarily measured by the facts as alleged in the pleadings'" in the underlying suit. *Kubit v. MAG Mut. Ins. Co.*, 708 S.E.2d 138, 144 (N.C. Ct. App. 2011) (quoting *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986)). "When the pleadings state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable." *Id.* (internal quotation marks omitted). "[T]he duty to defend arises," if at all, "when an insurer receives actual notice of the underlying action." *Id.* at 154.

---

[5] We agree with the parties that North Carolina law applies to determine Cincinnati's duties under the insurance policies. "[A] federal court sitting in diversity applies the conflict of laws provisions of the forum state, here South Carolina." *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 87 (4th Cir. 1989). "In construing insurance policies, South Carolina courts apply the law of the state where the policy was issued." *Companion Prop. & Cas. Ins. Co. v. Airborne Express, Inc.*, 631 S.E.2d 915, 916 (S.C. Ct. App. 2006). North Carolina law governs Cincinnati's claims because the policies at issue "were issued to a North Carolina corporation [WSC] at its principal place of business in Wilmington, North Carolina." *Cincinnati Ins. Co.*, 2025 WL 1753693, at *4.

"The duty to indemnify," on the other hand, "refers to an insurer's responsibility to pay a monetary award when its insured has become liable for a covered claim." *Perdue Farms*, 448 F.3d at 257–258. The "duty to [indemnify] is measured by the facts ultimately determined at trial." *Waste Mgmt.*, 340 S.E.2d at 377. "If the insurance policy provides coverage for the facts as found by the trier of fact, then the insurer has a duty to indemnify." *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC*, 692 S.E.2d 605, 611 (N.C. 2010). Unlike the duty to defend, the duty to indemnify arises, if at all, once liability in the underlying suit has been determined. *See Seguro-Suarez ex rel. Connette v. Key Risk Ins. Co.*, 819 S.E.2d 741, 753–754 (N.C. Ct. App. 2018) ("'[W]here the policy of insurance is against liability . . . and the liability of the insured has been established by judgment, the injured person may maintain an action on the policy of insurance, *that is, coverage attaches when liability attaches* . . . .'" (quoting *Hall v. Harleysville Mut. Cas. Co.*, 64 S.E.2d 160, 161 (N.C. 1951)).

Here, Cincinnati's duty to defend claim presented a justiciable Article III case or controversy. Under North Carolina law, Cincinnati's duty to defend arose, if at all, when Cincinnati "receive[d] actual notice" of the wrongful-death action. *Kubit*, 708 S.E.2d at 154. By the time Cincinnati filed its federal complaint, Cincinnati had received such notice, meaning its duty to defend had potentially arisen. The potential existence of that duty made Cincinnati's claim asking whether the duty existed ripe for review; the district court therefore had jurisdiction to decide that claim. *Cf. A/S J. Ludwig Mowinckles Rederi v. Tidewater Constr. Co.*, 559 F.2d 928, 932 (4th Cir. 1977) (explaining that "an

12

adjudication of liability [is] not a prerequisite to [an insured's] claim for indemnity . . . for counsel fees incurred in defending" a pending action).

We reach the same conclusion regarding Cincinnati's duty to indemnify claim. As noted above, the duty to indemnify arises, if at all, "when [the] insured has become liable for a covered claim." *Perdue Farms*, 448 F.3d at 257–258; *accord Connette*, 819 S.E.2d at 753–754. Therefore, if liability against the insured has been determined in the underlying suit, an insurer's duty to indemnify claim presents a live case or controversy. *See Trustgard*, 942 F.3d at 200; *see also Ellett Bros., Inc. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001); *Miller v. Augusta Mut. Ins. Co.*, 157 Fed. App. 632, 637 (4th Cir. 2005). After all, at that point, there is a concrete final judgment that has potentially triggered the insurer's duty. *See Connette*, 819 S.E.2d at 754 ("[C]overage attaches when liability attaches . . . ." (emphasis and internal quotation marks omitted)). Here, by the time Cincinnati filed its federal complaint, the state court had entered a default judgment against Hunt, potentially triggering Cincinnati's duty to indemnify. The potential existence of that duty made Cincinnati's claim asking whether the duty existed ripe for review; the district court therefore had jurisdiction to decide it.[6]

Owens's arguments to the contrary are unpersuasive. Owens contends that because Hunt's motion to vacate the state-court default judgment was pending at the time this suit

---

[6] We express no opinion on whether an insurer's duty to indemnify claim presents a live case or controversy where liability in the underlying suit "remains undetermined." *Trustgard*, 942 F.3d at 200 (discussing this issue); *see also id.* at 204–205 (Harris, J., concurring in the judgment). Instead, we merely hold that because liability here *was* determined, Cincinnati's duty to indemnify claim presented a live case or controversy.

13

was filed, there was actually "no final determination of the validity and enforceability of the default judgment in question." Opening Br. 14. According to Owens, Cincinnati's duty to indemnify claim was therefore not ripe for review.

This argument, however, rests on a false premise. Under South Carolina law, Hunt's motion to vacate the default judgment did "not affect the finality of [the] judgment or suspend its operation." S.C. R. Civ. P. 60. Rather, that judgment was "final and conclusive . . . unless an appeal [was] taken *and successfully prosecuted*." *Grooms v. Zander*, 144 S.E.2d 909, 910 (S.C. 1965) (emphasis added); *Armstrong v. Humphreys*, 5 S.C. 128, 130 (1874) (a judgment is "valid and conclusive until set aside upon appeal"). Put simply, that the motion to vacate the default judgment was pending in no way affected the judgment's finality. It follows that the pending motion likewise in no way affected the district court's jurisdiction to hear this case.

Owens next points out that his motion for supplemental proceedings was also pending before the state court at the time Cincinnati filed this suit. But that motion also did not affect the district court's jurisdiction. A motion for supplemental proceedings does not necessarily attack a judgment's validity, much less undermine its finality.[7] And Owens

---

[7] Under South Carolina law, "[i]f a judgment is unsatisfied, the judgment creditor may institute supplementary proceedings in circuit court to discover assets." *Katzburg v. Katzburg*, 764 S.E.2d 3, 5 (S.C. Ct. App. 2014). "In addition to their discovery functions, supplementary proceedings furnish a means of reaching, in aid of the judgment, property beyond the reach of an ordinary execution, such as choses in action." *Id.* (internal quotation marks omitted). Where, as here, a plaintiff (Owens) alleges that a defendant (Hunt) has "potential causes of action against" the defendant's insurance company, those causes of action may be "assignable as choses in action under a general judicial assignment." *Brockington v. Hunt*, No. 2023-CP-34-00107, 2025 WL 674181, at *3 (S.C. Ct. Common

has pointed to no authority showing otherwise.  At bottom, the state court had entered the default judgment against Hunt when Cincinnati filed this suit, and the default judgment was final under South Carolina law.  The district court therefore had jurisdiction to hear Cincinnati's duty to indemnify claim.

Because both of Cincinnati's claims presented justiciable Article III cases or controversies, we conclude that the district court did not err on constitutional grounds in refusing to stay this case.

2.

Owens next contends that prudential concerns counseled staying this case.  *See White*, 913 F.2d at 168 ("[A] district court may, in its discretion, refuse to issue a declaratory judgment.").  "[W]e review for abuse of discretion a district court's decision whether to hear a federal declaratory judgment action." *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004).

"'[A] declaratory judgment action is appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and when it will

_____

Pleas Jan. 2, 2025).  Supplemental proceedings are how an injured party obtains assignment of those choses in action.  *See id.* at *4 (assigning causes of action to plaintiff).

Here, Owens told the district court that he moved for supplemental proceedings in the state court to "seek[] a judicial assignment of any bad faith or breach of contract claims that Hunt may have against [Cincinnati]." J.A. 328.  He also stated that once he obtained the assignment, he would amend his federal answer to allege those assigned causes of action as counterclaims *in the federal suit*.  In other words, Owens himself admitted that the supplemental proceedings would go no further than determining whether Owens was entitled to an assignment of Hunt's potential causes of action against Cincinnati.  Under Owens's own concessions, those proceedings would not in any way (1) attack the default judgment against Hunt, or (2) determine whether the assigned causes of action were meritorious.

15

terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id.* (ellipsis omitted) (quoting *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996)). "When a related state court proceeding is pending, however, 'considerations of federalism, efficiency, and comity' should inform the district court's decision whether to exercise jurisdiction over a declaratory judgment action." *Id.* (quoting *Poston*, 88 F.3d at 257). "To aid district courts in balancing the state and federal interests when a parallel state action is pending, we have articulated four factors," often called the *Nautilus* factors, "for consideration":

> (1) whether the state has a strong interest in having the issues decided in its courts; (2) whether the state courts could resolve the issues more efficiently than the federal courts; (3) whether the presence of 'overlapping issues of fact or law' might create unnecessary 'entanglement' between the state and federal courts; and (4) whether the federal action is mere 'procedural fencing,' in the sense that the action is merely the product of forum-shopping.

*United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493–494 (4th Cir. 1998) (quoting *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 377 (4th Cir. 1994)).

All four *Nautilus* factors support the district court's refusal to stay this case. First, South Carolina state courts do not have a strong interest in deciding the question presented to the district court here: whether Cincinnati was timely and properly notified of the underlying state-court action such that it had a duty to defend and indemnify Hunt under North Carolina law. As we have explained, state courts do not have a strong interest in resolving a dispute where "the issues involved are standard" and the federal court is "unlikely to break new ground or be faced with novel issues of state interest." *Id.* at 494. Here, North Carolina's test for determining whether an insurer has a duty to defend or

16

indemnify despite a lack of proper notice is well-settled. *See Great Am. Ins. Co. v. C.G. Tate Constr. Co.*, 340 S.E.2d 743, 746–747 (N.C. 1986). All the district court had to do was apply the law to the facts. Moreover, North Carolina law applies to this dispute, but the underlying state-court action was in South Carolina state court. We reject Owens's contention that South Carolina courts have a strong interest in applying North Carolina law. *See Minn. Laws. Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 355 Fed. App. 698, 703 (4th Cir. 2009) ("Florida has no strong interest in the coverage issue to be determined under Virginia law.").

Second, nothing suggests that the state court could resolve the issue more efficiently than the district court did. By the time Cincinnati filed this suit, the state court had entered a default judgment against Hunt. The case was over, and the only issues left unresolved were whether Hunt could vacate the default judgment and, later, whether Owens could conduct supplemental proceedings. Cincinnati also was "not a party in the state action," so the state court had no ability to address the coverage issue presented here. *Coffey*, 368 F.3d at 414. The district court could thus decide the issue "just as efficiently"—if not more efficiently—than the state court. *Kapiloff*, 155 F.3d at 494.

Third, there was minimal, if any, potential for entanglement between the state court and the district court. The district court was set to address only one issue: whether Cincinnati was given proper notice of the lawsuit such that it had a duty to defend or indemnify Hunt. That issue is distinct from the issues that were pending in the state court—i.e., whether the default judgment should be vacated and whether Hunt's rights should be assigned to Owens. Owens argues that the district court prejudged the merits of Hunt's

17

motion to vacate the default judgment by finding that the default judgment was valid and enforceable. Opening Br. 22 (arguing that the district court's grant of summary judgment "decide[d] the issue of service of process" presented in the motion to vacate the default judgment "by declaring the judgment 'valid and enforceable'"). That is incorrect. The district court did not hold that service in the wrongful-death action was proper. Instead, by entering the default judgment, the state court did. *See* J.A. 183 (directing entry of default after finding that it "appear[ed]" that Hunt was "properly served"); J.A. 188 (granting default judgment in reliance on order directing entry of default). That finding was (and is) "final and conclusive . . . unless an appeal is taken and successfully prosecuted." *Grooms*, 144 S.E.2d at 910. The district court did not entangle itself with the state court by prejudging the merits of the motion to vacate. Instead, it merely observed what the state court had already determined.

Fourth, and finally, Owens has not "advanced convincing evidence" that Cincinnati is "procedurally fencing or forum-shopping" in this case. *Coffey*, 368 F.3d at 414. Indeed, Owens concedes that the fourth *Nautilus* factor does not favor him. *See* Opening Br. 23.

Given that all four *Nautilus* factors support the district court's decision not to stay this case, we conclude that the court did not abuse its discretion in denying Owens's various motions for a stay.

## B.

We next consider the district court's denial of Owens's motion to amend his answer to assert a counterclaim for a declaration that Cincinnati must pay the state-court judgment pursuant to an MCS-90 endorsement. As noted above, the district court found that the

18

proposed amendment would be futile.  We review the district court's futility determination de novo.  *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 274 (4th Cir. 2014).

We begin by briefly describing the MCS-90 endorsement.  Then we address Owens's arguments on appeal.

1.

The MCS-90 endorsement is a creature of federal law.  *See Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 492 (4th Cir. 2003).  In 1980, Congress passed the Motor Carrier Act (MCA) "in part[] to address abuses that had arisen in the interstate trucking industry which threatened public safety."  *Id.* at 489.  "[O]ne remedial measure provided in the MCA is a liability insurance requirement imposed upon each motor carrier registered to engage in interstate commerce . . . ."  *Id.*  Under that requirement, a motor carrier must "file 'a bond, insurance policy, or other type of security' in an amount determined by the Secretary of Transportation and the laws of the State or States in which the motor carrier intends to operate."  *Id.* (quoting 49 U.S.C. § 13906(a)(1)).  "The security must be sufficient to pay, not more than the amount of the security, for each [qualifying] final judgment against the registrant"—i.e., the registered motor carrier.  49 U.S.C. § 13906(a)(1).

In line with this statutory directive, regulations implementing the MCA "mandat[e] that every liability insurance policy covering a 'motor carrier' contain the MCS-90 endorsement" or some substitute "to establish a minimal financial responsibility baseline."  *Canal Ins.*, 320 F.3d at 489 (first quote) (citing 49 C.F.R. §§ 387.7(a), 387.9, 387.15); *Trustgard*, 942 F.3d at 198 (second quote); *see also* 49 U.S.C. § 13906(f) (instructing the

19

Secretary of Transportation to "prescribe the appropriate form of endorsement" that will subject insurance policies and surety bonds "to the full security limits of the coverage required under this section"). The MCS-90 endorsement is a form endorsement that "must be in the form prescribed by the FMCSA [(Federal Motor Carrier Safety Administration)] and approved by the OMB [(Office of Management and Budget)]." 49 C.F.R. § 387.15. "'[T]he primary purpose of the MCS-90 [endorsement] is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers.'" *Canal Ins.*, 320 F.3d at 490 (quoting *John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 857 (9th Cir. 2000)). In relevant part, the endorsement provides:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.
>
> …
>
> [N]o condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

20

Form MCS-90, at 2, https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2024-08/MCS-90%20Form.pdf [https://perma.cc/E9KM-VYHM].

As seen, the endorsement mandates that the "insurer . . . agree[] to pay . . . any [qualifying] final judgment recovered against the insured." *Id.* And it does so "regardless of . . . whether the loss was otherwise excluded by the terms of the policy." *Tri-Nat'l, Inc. v. Yelder*, 781 F.3d 408, 414 (8th Cir. 2015) (internal quotation marks omitted). That is, the endorsement "creates a suretyship by the insurer to protect the public when the insurance policy to which the MCS-90 endorsement is attached otherwise provides no coverage to the insured." *Canal Ins.*, 320 F.3d at 490; *see Trustgard*, 942 F.3d at 198.

2.

Owens sought to invoke the MCS-90 endorsement here on the theory that even if Cincinnati prevailed in arguing that its lack of notice entitled it not to pay the state-court judgment under the issued insurance policies, the MCS-90 endorsement nevertheless would require payment. The issue, however, is that the endorsement requires coverage only of a "final judgment recovered *against the insured.*" Form MCS-90, at 2 (emphasis added). The district court found that the term "insured," as it is used in the MCS-90 endorsement, refers only to the insured specifically named in the insurance policy to which the endorsement is attached. And because Hunt was not named in the underlying Cincinnati policies, but the state-court judgment was entered against Hunt, the court found that any amendment seeking to enforce any MCS-90 endorsement as to the judgment against Hunt would be futile. Owens now argues that the district court erred. We disagree.

21

This issue turns on interpreting the applicable regulations. "As with the interpretation of statutes, our interpretation of regulations begins with their text." *Laird v. Redwood Tr. LLC*, 392 F.3d 661, 668 (4th Cir. 2004). "'When a [regulation] includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning." *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) (quoting *Burgess v. United States*, 553 U.S. 124, 130 (2008)).

Though the MCS-90 endorsement form itself does not define "insured," an applicable regulation does. As noted above, the MCS-90 endorsement is a form endorsement whose wording is mandated by the FMCSA. *See* 49 C.F.R. § 387.15. The FMCSA makes the form available through a hyperlink found in subpart A of part 387 of Title 49 of the Code of Federal Regulations. *See id.* In other words, the form is incorporated by reference into a specific subpart of the regulations.[8] Section 387.5 sets forth the definitions for various terms "used in th[at] subpart." *Id.* § 387.5.

Key here, Section 387.5 defines "[i]nsured and principal [to] mean[] the motor carrier *named* in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." *Id.* (italics omitted and emphasis added). Thus, as relevant here, the term "insured," as used in all of subpart A—including

---

[8] Previously, the MCS-90 endorsement was set out in full in an illustration in Section 387.15. *See*, *e.g.*, *Canal Ins.*, 320 F.3d at 489–490 (citing the MCS-90 endorsement as being found at "49 C.F.R. § 387.15, at Illustration I"). In 2018, however, the FMCSA replaced the full text of the endorsement in Section 387.15 with a hyperlink to the endorsement on the agency's website. *See Electronic Documents and Signatures*, 83 Fed. Reg. 16210, 16217–16218 (Apr. 16, 2018).

the MCS-90 endorsement—means the "named" insured.[9]  *See Ooida Risk Retention Grp., Inc. v. Williams*, 579 F.3d 469, 477 (5th Cir. 2009) ("The federal regulation that requires the MCS-90 Endorsement clearly defines the 'insured' as 'the motor carrier *named* in the policy of insurance . . . .'" (quoting 49 C.F.R. § 387.5)).  And the named insured is "the

---

[9] In full, the relevant definition in Section 387.5 states: "*Insured and principal* means the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier."  49 C.F.R. § 387.5 (italics in original).  Though Owens does not make the argument, a reader could wonder if the definition defines the compound term "insured and principal," not the individual words "insured" and "principal."  We reject that reading for three reasons.  First, and most notably, reading the definition to define the compound term "insured and principal" would render the entire definition superfluous because that compound term appears nowhere in subpart A of part 387, the subpart to which the definition applies.  *See Baldwin ex rel. Baldwin v. Dir., Off. of Workers' Comp. Programs*, 170 F.4th 273, 284 (4th Cir. 2026) ("'[C]onstructions which render regulatory provisions superfluous are to be avoided.'" (quoting *Black & Decker Corp. v. Comm'r*, 986 F.2d 60, 65 (4th Cir. 1993)); *see also Minimum Levels of Financial Responsibility for Motor Carriers*, 46 Fed. Reg. 30974 (June 11, 1981) (defining "insured and principal" in Section 387.5 but not using the term in any part of the regulations to which the definition applied).  Second, considering Section 387.5's amendment history, the singular verb "means" does not show that the term "insured and principal" is defined as a compound term.  Previously, Section 387.5's definition of "insured and principal" consisted only of the italicized words followed by a dash and the text of the definition.  *See General Technical, Organizational, and Conforming Amendments to the Federal Motor Carrier Safety Regulations*, 78 Fed. Reg. 58470, 58473 (Sept. 24, 2013).  In 2013, the FMCSA replaced all the dashes in Section 387.5's various definitions with the word "means," without addressing the definition of "insured and principal" specifically.  *Id.*  In doing so, the agency clarified that the changes "[did] not . . . make any substantive changes to the [Code of Federal Regulations]."  *Id.* at 58471.  In other words, replacing the dash with the word "means" was a uniform, non-substantive edit.  Third, as noted below, the FMCSA itself has relied on Section 387.5's definition of "insured and principal" to clarify, in "formal agency guidance . . . published in the Federal Register," that the single word "insured" in the MCS-90 endorsement means the "named insured."  *See Regulatory Guidance for Forms Used to Establish Minimum Levels of Financial Responsibility of Motor Carriers*, 70 Fed. Reg. 58065, 58066 (Oct. 5, 2005) (citing 49 C.F.R. § 387.5).  That is, the FMCSA's formal view is that its own definition defines both "insured" and "principal" individually; it does not define the compound term "insured and principal."

person *specifically designated* in the policy as the one protected." *Named Insured*, *Black's Law Dictionary* (5th ed. 1979) (emphasis added).

Other contextual clues confirm that the term "insured" in the MCS-90 endorsement means "named insured." *See Mohamed v. Bank of Am., N.A.*, 93 F.4th 205, 211 (4th Cir. 2024) ("[W]e must read [a] regulation's words—just like a statute's—in their context and with a view to their place in the overall regulatory scheme." (internal quotation marks and brackets omitted)).  First, the applicable statute states that the required insurance must be "sufficient to pay . . . for each final judgment *against the registrant*," i.e., the registered motor carrier to whom the insurance policy is issued.  49 U.S.C. § 13906(a)(1) (emphasis added).  Owens's proposal to read "insured" to include unnamed insureds would thus require insurers to pay judgments beyond those that the statute mandates be paid.  *See Armstrong v. U.S. Fire Ins. Co.*, 606 F. Supp. 2d 794, 824 (E.D. Tenn. 2009) ("The . . . language of the statute clearly suggests that the purpose of the MCS-90 is to assure payment of a final judgment against the registered motor carrier . . . ."); *Sentry Select Ins. Co. v. Thompson*, 665 F. Supp. 2d 561, 567 (E.D. Va. 2009) (similar).

Second, other uses of the term "insured" in the MCS-90 endorsement and the regulations confirm that "insured" means "named insured." *See Armstrong*, 606 F. Supp. 2d at 824–825.  To begin, the MCS-90 endorsement states that it is intended to "assure compliance by *the insured*, within the limits stated herein, *as a motor carrier of property*, with [the MCA]."  Form MCS-90, at 2 (emphases added).  That is, the endorsement itself equates the "the insured" with the "motor carrier of property" that is required to comply with the statute—i.e., the motor carrier to whom the underlying insurance policy is issued.

24

*Id.* The endorsement also states that "[t]he insured agrees to reimburse [the insurer]" for certain payments made by the insurer, and that "[c]ancellation of this endorsement may be effected by the [insurer] or the insured." *Id.* at 1–2; *see also* 49 C.F.R. § 387.5 (defining "[c]ancellation of insurance" to mean "the withdrawal of insurance coverage by either the insurer or *the insured*" (emphasis added)). Reading "insured" to mean *all* insureds would lead to the untenable conclusion that unnamed insureds like Hunt—who are not parties to the insurance contract or the endorsement—agree to reimburse the insurer for certain payments. It would also lead to the conclusion that a non-party to the endorsement could cancel the endorsement. Those conclusions cannot be right. *See Armstrong*, 606 F. Supp. 2d at 824–825. Context thus shows that the term "insured" in the MCS-90 endorsement refers to the "named insured."

The FMCSA and numerous courts have reached the same conclusion. In 2005, the FMCSA issued formal regulatory guidance in which it directly confronted this question and instructed that "Form[] MCS-90 . . . [is] not intended, and do[es] not purport, to require insurance companies or sureties to satisfy a judgment against any party other than the motor carrier *named in the endorsement* or its fiduciary." *Regulatory Guidance for Forms Used to Establish Minimum Levels of Financial Responsibility of Motor Carriers*, 70 Fed. Reg. 58065, 58066 (Oct. 5, 2005) (emphasis added) (citing 49 C.F.R. § 387.5). Since that guidance, "federal courts have been virtually unanimous in holding that the MCS-90 endorsement provides coverage only to the named insured." *Forkwar v. Progressive N. Ins. Co.*, 910 F. Supp. 2d 815, 826 (D. Md. 2012) (collecting cases); *see Forkwar v. Progressive N. Ins. Co.*, 537 Fed. App. 197, 198 (4th Cir. 2013) ("affirm[ing] on the

25

reasoning of the district court"); 1 William J. Schermer & Irvin E. Schermer, *Automobile Liability Insurance* § 2:14 & nn.3, 11–19 (4th ed.) (updated May 2026) ("The majority position holds that the MCS-90 affords protection for the public only for judgments obtained against the motor carrier, and does not obligate the insurer to pay a judgment obtained against the driver or other permissive user." (collecting cases)).  To be sure, before 2005 some courts rejected requests "to read the use of the word 'insured' in the [MCS-90] endorsement as referring only to [the] named 'insured.'"  *Nueva*, 229 F.3d at 859; *see Adams v. Royal Indem. Co.*, 99 F.3d 964, 970–971 (10th Cir. 1996).  But given our analysis of the regulatory definition, the regulatory context, the near consensus in federal case law, and the FMCSA's guidance, we find those decisions unpersuasive.

We hold that the MCS-90 endorsement applies only to judgments entered against the named insured.  That is, it applies only to judgments entered against the motor carrier "*specifically designated* in the policy as the one protected."  *Named Insured*, *Black's Law Dictionary* (5th ed. 1979) (emphasis added).  Because Hunt was not specifically designated as the insured in the Cincinnati policies, and the judgment for which Owens seeks recovery was entered only against Hunt, we agree with the district court that any attempt to enforce an MCS-90 endorsement as to the judgment against Hunt would be futile.  *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (explaining that an amendment is futile where the amended count "does not properly state a claim").  We therefore affirm the district court's denial of Owens's motion for leave to amend.

26

C.

Owens lastly argues that "[s]ummary judgment was premature in light of the issues raised by [his] motions to stay and amend."[10]  Opening Br. 27.  We review the timing of the district court's summary judgment ruling for abuse of discretion.  *See McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014).

As an initial matter, Owens's contention that the district court's summary judgment ruling was premature is underdeveloped.  *See Grayson O*, 856 F.3d at 316 ("A party waives an argument . . . by failing to develop [his] argument—even if [his] brief takes a passing shot at the issue." (internal quotation marks omitted)).  He first claims that summary judgment was premature because he "presented the [d]istrict [c]ourt with substantial questions of jurisdiction, abstention, and adherence to the MCA."  Opening Br. 27.  But he does not explain why the presence of "substantial questions" required the court to defer ruling on Cincinnati's motion for summary judgment.  He next quotes the assertions he made to the district court in his motion for a stay, and then claims, without support, that "these considerations demanded the [d]istrict [c]ourt defer or deny [Cincinnati's] motion for summary judgment."  *Id.*  But again, he offers no developed argument for why that's the case.

---

[10] Owens does not meaningfully contest the merits of the district court's summary judgment ruling.  He has therefore forfeited that issue.  *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).  The closest he comes to touching on the merits of the court's decision is by asserting that the district court's "finding" that the state-court default judgment was "valid and enforceable" was lacking any "analysis."  Opening Br. 27 (internal quotation marks omitted).  As we explained above, however, the district court did not "find" that the default judgment was valid and enforceable.  It merely observed what the state court had already determined.

To the extent Owens claims that deferral was warranted because he could not "present facts essential to justify [his] opposition" to Cincinnati's motion for summary judgment, that argument fails. Fed. R. Civ. P. 56(d). Contrary to Owens's suggestion elsewhere in his brief, he had the opportunity to conduct discovery surrounding any MCS-90 endorsements relevant to this case. The federal rules allow parties to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim *or defense*." Fed. R. Civ. P. 26(b)(1) (emphasis added). And here, Owens raised the MCS-90 endorsement as a defense. He did not also have to assert an MCS-90 endorsement counterclaim to have access to discovery on that issue.

Further, to the extent he makes the argument at all, Owens provides no support for the proposition that the district court could not rule on Cincinnati's motion for summary judgment before the state-court motion for supplemental proceedings was resolved and Owens obtained an assignment of any causes of action Hunt had against Cincinnati. Indeed, such a holding would contravene our general rule that—assuming jurisdiction is present and the *Nautilus* factors are satisfied—a federal court may proceed with a declaratory judgment action even "when a parallel state action is pending." *Coffey*, 368 F.3d at 412.

In short, Owens has failed to show that the district court abused its discretion in ruling on Cincinnati's motion for summary judgment when it did. We therefore reject this assignment of error as well.

28

III.

For the foregoing reasons, the district court's judgment is

*AFFIRMED*.